ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Represented by counsel, Plaintiff Robert A. Hastrich ("Plaintiff") brings this action pursuant to Title II of the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner," or "Defendant") denying his application for disability insurance benefits ("DIB"). (Dkt. 1). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. 10; Dkt. 15), and Plaintiff's reply (Dkt. 16). For the reasons discussed below, the Commissioner's motion (Dkt. 15) is granted and Plaintiff's motion (Dkt. 10) is denied.
BACKGROUND
Plaintiff protectively filed his application for DIB on June 23, 2014. (Dkt. 8 at 15, 92).[1] In his application, Plaintiff alleged disability beginning June 6, 2013, due to a neck injury, back injury, allergies, bilateral carpal tunnel syndrome, left ring finger injury, and right knee injury. (Id. at 15, 82). Plaintiff's application was initially denied on August 19, 2014. (Id. at 15, 96-107). At Plaintiff's request, a hearing was held before administrative law judge ("ALJ") Melissa Lin Jones, in Buffalo, New York, on November 22, 2016. (Id. at 15, 32-81). On January 24, 2017, the ALJ issued an unfavorable decision. (Id. at 12-26). Plaintiff requested Appeals Council review; his request was denied on February 15, 2018, making the ALJ's determination the Commissioner's final decision. (Id. at 5-7). This action followed.
LEGAL STANDARD
I. District Court Review
"In reviewing a final decision of the [Social Security Administration ("SSA") ], this Court is limited to determining whether the SSA's conclusions were supported *392 by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue , 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted); see also 42 U.S.C. § 405(g). The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue , 569 F.3d 108, 112 (2d Cir. 2009) (quotation omitted). It is not the Court's function to "determine de novo whether [the claimant] is disabled." Schaal v. Apfel , 134 F.3d 496, 501 (2d Cir. 1998) (quotation omitted); see also Wagner v. Sec'y of Health & Human Servs. , 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not de novo and that the Secretary's findings are conclusive if supported by substantial evidence). However, "[t]he deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart , 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler , 748 F.2d 109, 112 (2d Cir. 1984) ).
II. Disability Determination
An ALJ follows a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. See Bowen v. City of New York , 476 U.S. 467, 470-71, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). At step one, the ALJ determines whether the claimant is engaged in substantial gainful work activity. See 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities. Id. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does have at least one severe impairment, the ALJ continues to step three.
At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). Id. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (id. § 404.1509), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. See id. § 404.1520(e).
The ALJ then proceeds to step four and determines whether the claimant's RFC permits the claimant to perform the requirements of his or her past relevant work. Id. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. Id. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience. Rosa v. Callahan , 168 F.3d 72, 77 (2d Cir. 1999) (quotation omitted); see also 20 C.F.R. § 404.1560(c).
DISCUSSION
I. The ALJ's Decision
In determining whether Plaintiff was disabled, the ALJ applied the five-step *393 sequential evaluation set forth in 20 C.F.R. § 404.1520. Initially, the ALJ determined that Plaintiff last met the insured status requirements of the Act on December 31, 2018. (Dkt. 8 at 17). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful work activity since June 6, 2013, the alleged onset date. (Id. ).
At step two, the ALJ found that Plaintiff suffered from the severe impairments of: "degenerative disc disease of the lumbar and cervical spine (status-post multiple surgeries); L5 radiculopathy : history of nondisplaced fracture of the right knee and mild right knee chondromalacia patella." (Id. ). The ALJ further found that Plaintiff's medically determinable impairment of bilateral carpal tunnel syndrome was non-severe. (Id. ). With respect to Plaintiff's representation that he suffered from allergies and a left ring finger injury, the ALJ concluded that these were not medically determinable impairments. (Id. ).
At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (Id. ). The ALJ particularly considered the criteria of Listings 1.02 and 1.04 in reaching her conclusion. (Id. at 18).
Before proceeding to step four, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with the additional limitations that Plaintiff:
can occasionally kneel, stoop, crouch, climb ramps or stairs (but never climb ladders, ropes or scaffolds), occasionally reach overhead or repetitively bend or twist at the waist. He requires a sit/stand option in that he can sit for 45 minutes but then must be afforded the opportunity to stand or walk for 15 minutes while remaining on task.
(Id. at 18). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Id. at 24).
At step five, the ALJ relied on the testimony of a vocational expert ("VE") to conclude that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of surveillance system monitor, charge account clerk, and call out operator. (Id. at 24-25). Accordingly, the ALJ found that Plaintiff was not disabled as defined in the Act. (Id. at 25-26).
II. The Commissioner's Determination is Supported by Substantial Evidence and Free from Legal Error
Plaintiff asks the Court to reverse the decision of the Commissioner, arguing: (1) the ALJ improperly weighed the opinion of Plaintiff's treating neurosurgeon, Franco Vigna, M.D.; (2) the ALJ erred at step two of the sequential analysis by finding that Plaintiff's bilateral carpal tunnel syndrome was non-severe, and did not include any manipulative limitations in the RFC; (3) the ALJ improperly relied on evidence of Plaintiff's daily activities as evidence of his ability to perform substantial gainful activity; and (4) the ALJ failed to consider Plaintiff's learning disability. (Dkt. 10-1 at 13). The Court has considered each of these arguments and, for the reasons discussed below, finds them to be without merit.
A. Assessment of Dr. Vigna's Opinion
Plaintiff's first argument is that the ALJ improperly assigned minimal weight to the medical source statement of Dr. Vigna, Plaintiff's treating neurosurgeon. (Id. ). Because Plaintiff's claim was filed before March 27, 2017, the ALJ was *394 required to apply the treating physician rule, under which a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2). Under the treating physician rule, if the ALJ declines to afford controlling weight to a treating physician's medical opinion, he or she "must consider various factors to determine how much weight to give to the opinion." Halloran v. Barnhart , 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks omitted). These factors include:
(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.
Id. "An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]" Scitney v. Colvin , 41 F.Supp.3d 289, 301 (W.D.N.Y. 2014) (internal quotation omitted).
Whatever weight the ALJ assigns to the treating physician's opinion, he must "give good reasons in [his] notice of determination or decision for the weight [he gives to the] treating source's medical opinion." 20 C.F.R. § 404.1527 (c)(2) ; see also Harris v. Colvin , 149 F.Supp.3d 435, 441 (W.D.N.Y. 2016) ("A corollary to the treating physician rule is the so-called 'good reasons rule,' which is based on the regulations specifying that 'the Commissioner "will always give good reasons' " for the weight given to a treating source opinion." (quoting Halloran , 362 F.3d at 32 ) ). "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific ...." Harris , 149 F.Supp.3d at 441 (internal quotation marks omitted). The Second Circuit "[does] not hesitate to remand when the Commissioner's decision has not provided 'good reasons' for the weight given to a [treating physician's] opinion and [it] will continue remanding when [it] encounter[s] opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran , 362 F.3d at 33.
Plaintiff began treating with Dr. Vigna in May 2013, and Dr. Vigna performed multiple surgeries on Plaintiff's spine. (Dkt. 8 at 866). On October 12, 2016, Dr. Vigna completed a Physical Medical Source Statement assessing Plaintiff's functional limitations. (Id. at 866-70). Dr. Vigna opined that Plaintiff could walk one-half city block without rest or severe pain, sit for five to ten minutes at one time, stand for thirty minutes at one time, and sit and stand/walk for a total of two hours in an eight-hour workday. (Id. at 867). Plaintiff required a job that permits shifting positions at will, and needed to walk for ten minutes, every thirty minutes. (Id. ). Due to his pain/paresthesias and numbness, Plaintiff also would need to take a ten to fifteen-minute unscheduled break every ninety minutes. (Id. at 867-68). Plaintiff could occasionally lift ten pounds, but never lift twenty or more pounds. (Id. at 868). He could never twist, stoop (bend), or climb ladders, and could rarely crouch/squat or climb stairs. (Id. ). Plaintiff did not have significant limitations with reaching, handling, or fingering. (Id. ). However, Dr. Vigna opined that Plaintiff could: use his right and left hands to grasp, turn, and twist objects fifty percent of the time during an eight-hour workday; use his right and left fingers for fine manipulations fifty *395 percent of the time; use his right and left arms for reaching in front of his body ten percent of the time; and use his right and left arms for reaching overhead ten percent of the time. (Id. at 869). Plaintiff would be off-task twenty-five percent or more of the workday, and was capable of performing low-stress work. (Id. ). According to Dr. Vigna, Plaintiff's impairments would produce "good days" and "bad days," and he would be absent, on average, more than four days per month. (Id. ).
The ALJ gave "little weight" to Dr. Vigna's opinion. (Id. at 24). The ALJ recognized that although Dr. Vigna was a treating physician:
his findings overestimate [Plaintiff's] sitting limitations, need for breaks, anticipated time off-task/absences and manipulative limitations; these findings are inconsistent with the minimal evidence of difficulty with prolonged standing (if afforded positional changes as set forth in the residual functional capacity adopted above), intact manipulative functioning (as demonstrated upon physical examinations) and his relatively broad range of daily activities. Moreover, there is no evidence of cognitive difficulties or significant pain/distractibility to support a need for time off-task or work absences as suggested by Dr. Vigna.
(Id. ). The Court has reviewed Dr. Vigna's treatment records, particularly those leading up to and around the time of the October 2016 opinion. (See id. at 900-71). While the records occasionally note that Plaintiff walked with an antalgic gait or utilized a cane (see id. at 902, 909, 918, 932, 959), and an imaging study done in October 2016 showed "mild loss of disc height at L3-4," overall, the records fail to document objective evidence supporting the severe limitations assessed by Dr. Vigna. Rather, Dr. Vigna's objective examinations of Plaintiff (including examinations of Plaintiff's musculoskeletal system) were mostly normal. (See, e.g. , id. at 902, 905, 909, 945, 950, 954-55, 959, 968). Imaging studies taken after Plaintiff's surgeries showed well-maintained disc heights and normal alignment, with good positioning of hardware. (Id. at 902, 905, 948). While the records document Plaintiff's complaints regarding his lumbar, leg, and foot pain, "subjective complaints alone are not a basis for an award of disability insurance benefits in the absence of corroborating objective medical evidence." Mauro v. Comm'r of Soc. Sec. , 746 F. App'x 83, 84 (2d Cir. 2019).
The Court further notes that there is little objective evidence supporting Dr. Vigna's opinion that Plaintiff would be off-task twenty-five percent or more and would be absent more than four days per month. Rather, Dr. Vigna's opinion is offered in a fill-in-the-blank form, with no explanation as to why such severe limitations were necessary. (See Dkt. 8 at 869; see also Emery v. Astrue , No. 2:11-CV-248, 2012 WL 4892635, at *10, 2012 U.S. Dist. LEXIS 147970, at *29 (D. Vt. Oct. 15, 2012) (ALJ did not err in his analysis of doctor's opinion where it was "given on a fill-in-the-blank-type form, and ... accompanied by little explanation."); see also Halloran , 362 F.3d at 31 n.2 (standardized form was "only marginally useful for purposes of creating a meaningful and reviewable factual record.") ). The lack of explanation is particularly problematic in this case, where Dr. Vigna's treatment notes contain little objective evidence supporting severe functional limitations. Accordingly, the ALJ's conclusion that the evidence in support of Dr. Vigna's severe limitations was lacking, as well as that such severe limitations were inconsistent with the record as a whole, is supported by substantial evidence. It was therefore proper for the *396 ALJ to assign little weight to Dr. Vigna's opinion. Halloran , 362 F.3d at 32 ("the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record....").
The Court notes that, in addressing Dr. Vigna's opinion, the ALJ also considered other factors required by the treating physician rule. For example, the ALJ considered Dr. Vigna's treatment relationship with Plaintiff, as well as his specialty. The ALJ recognized that Dr. Vigna was a treating physician, performed surgeries on Plaintiff's spine, and discussed Dr. Vigna's treatment of Plaintiff dating back to 2013. (See Dkt. 8 at 22-24). Further, prior to discussing opinion evidence from Dr. Vigna, the ALJ discussed the August 2014 opinion offered by the consultative examiner, Hongbiao Liu, M.D., who found that Plaintiff had "mild to moderate limitation for prolonged walking, bending, and kneeling." (Id. at 22; see also id. at 846). Accordingly, the ALJ's consideration of Dr. Vigna's medical source statement was proper.
Plaintiff contends that, contrary to the ALJ's findings, there is objective evidence in the record supporting Dr. Vigna's opinion. (Dkt. 10-1 at 13-14). Specifically, Plaintiff points to various imaging studies in the record, including EMGs, MRIs, and a myelogram, which were performed between 2005 and 2015. (Id. at 14). The Court has reviewed the reports associated with those imaging studies and agrees that they showed at least some evidence of abnormality. However, the record also shows that Plaintiff underwent successful procedures to address these issues. Plaintiff himself reported that many of these procedures were successful in relieving his pain. (See, e.g. , Dkt. 8 at 743 (November 2013 treating note from Dr. Vigna stating, "I follow with [Plaintiff] secondary to a work-related injury to his lumbar spine. He states that he was so happy with the results of the low back surgery that he wanted to come and see me for his cervical spine."); id. at 892 (in August 2014, following Plaintiff's cervical spine surgery, Dr. Vigna "had the pleasure of seeing [Plaintiff] back in the office today. He states that he has 'none of the pain that I had before surgery.' "); id. at 908-09 (in May 2015, following Plaintiff's lumbar spine surgery, Plaintiff noticed improvement in the spasms he was having in his back prior to surgery, but still experienced some ongoing low back pain; objective physical examination of Plaintiff's musculoskeletal system was normal, with "[f]ull range of motion in his bilateral lower extremities."); id. at 931-32 (in February 2016, following implantation of a spinal stimulator, Plaintiff reported that the stimulator "took away 'almost all' of his left foot pain"; Plaintiff continued to report lower back pain, but a physical examination was normal, other than that Plaintiff walked with a "slightly left antalgic gait.") ). Where Plaintiff's pain was not fully addressed by these procedures, as noted above, there is a lack of objective evidence in the record - such as abnormal objective physical examinations, or further imaging studies showing Plaintiff's deteriorating condition - to support the severe functional limitations assessed by Dr. Vigna.
Plaintiff also contends that there is evidence in the record supporting his sitting and standing limitations. (Dkt. 10-1 at 15). Plaintiff cites to several instances in the record between May 2013 and June 2015 where the record notes his difficulty standing and sitting. (Id. at 15-16). The evidence cited by Plaintiff, however, is entirely predicated on his own subjective complaints. As explained by the ALJ, Dr. Vigna's opinion is not supported by objective evidence supporting such severe standing and sitting restrictions, nor does it provide *397 an explanation as to why Dr. Vigna assessed severe limitations in the absence of objective evidence. See Marozzi v. Berryhill , No. 6:17-cv-06864-MAT, 2019 WL 497629, at *5, 2019 U.S. Dist. LEXIS 20575, at *15 (W.D.N.Y. Feb. 8, 2019) (where the ALJ assigned reduced weight to a treating physician opinion, the ALJ appropriately considered the lack of objective evidence supporting the physician's opinion that the plaintiff had significant sitting limitations).
In sum, the ALJ was cognizant of Plaintiff's limitations due to ongoing issues with his back. The ALJ accounted for these limitations by limiting Plaintiff to sedentary work and affording Plaintiff a sit/stand option (allowing Plaintiff to sit for forty-five minutes and then stand/walk for fifteen minutes) to account for any sitting/standing limitations. (See Dkt. 8 at 18). The ALJ's assessment that the record does not support the harsh limitations assessed by Dr. Vigna is proper and well-supported by the record. Accordingly, neither reversal, nor remand, is required on this basis.[2]
B. The Step Two Determination
Plaintiff next argues that the ALJ erred by finding that his bilateral carpal tunnel syndrome was a non-severe impairment and by failing to include any manipulative limitations in the RFC. (Dkt. 10-1 at 16).
At step two of the disability analysis, the ALJ determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities. Id. § 404.1520(c). The Commissioner's Regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b).
"The claimant bears the burden of presenting evidence establishing severity." Taylor v. Astrue , 32 F.Supp.3d 253, 265 (N.D.N.Y. 2012), adopted , 32 F.Supp.3d 253 (N.D.N.Y. 2012). Step two's "severity" requirement is de minimis and is meant only to screen out the weakest of claims. Dixon v. Shalala , 54 F.3d 1019, 1030 (2d Cir. 1995). However, despite this lenient standard, the " 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.' " Taylor , 32 F.Supp.3d at 265 (quoting Coleman v. Shalala , 895 F.Supp. 50, 53 (S.D.N.Y. 1995) ). Rather, "to be considered severe, an impairment or combination of impairments must cause 'more than minimal limitations in [a claimant's] ability to perform work-related functions.' " Windom v. Berryhill , No. 6:17-cv-06720-MAT, 2018 WL 4960491, at *3, 2018 U.S. Dist. LEXIS 176372, at *7 (W.D.N.Y. Oct. 14, 2018) (quoting *398 Donahue v. Colvin , No. 6:17-CV-06838(MAT), 2018 WL 2354986, at *5, 2018 U.S. Dist. LEXIS 87554, at *15 (W.D.N.Y. May 24, 2018) ) (alteration in original).
At step two of the sequential analysis, the ALJ found that Plaintiff had several severe impairments, but concluded that Plaintiff's bilateral carpal tunnel syndrome, for which he underwent bilateral releases in 2010 and 2011, was not severe. (Dkt. 8 at 17). The ALJ explained that "the record reveals minimal residual symptoms or work-related limitations stemming from this condition." (Id. ).
In 2010, Plaintiff sought treatment from Kevin W. Lanighan, M.D., for bilateral hand paresthesias. (Id. at 874). Dr. Lanighan diagnosed bilateral carpal tunnel syndrome and requested authorization to proceed with right and left release procedures. (Id. at 875). A right endoscopic carpal tunnel release was performed on November 23, 2010 (id. at 878), and a left endoscopic carpal tunnel release was performed on December 30, 2010 (id. at 881). Following both procedures, Plaintiff reported resolution of the numbness in his hands, but reported some weakness and soreness in his palms. (Id. at 879, 882). By February 2011, Plaintiff was "working light-duty restrictions," reported tenderness over his left palm, but moved his hand and fingers comfortably, and "seem[ed] to be making progress." (Id. at 885).
On March 9, 2011, Plaintiff reported that he had "returned to work and overall has been tolerating things well," and "den[ied] any continued paresthesias." (Id. at 887). A physical examination showed that Plaintiff's surgical scars were well-healed, and he had full mobility of the wrist, hand, and fingers. (Id. ). His "[r]adial pulses [were] +2 and capillary refill [was] brisk. Cranial nerves II-XII [were] grossly intact." (Id. ). Dr. Lanighan "encouraged [Plaintiff] to continue progressing with his activities," and stated that he would see Plaintiff back on an "as-needed" basis. (Id. ). On December 28, 2011, Plaintiff saw Dr. Lanighan for a permanency evaluation. (Id. at 889). Dr. Lanighan noted that Plaintiff had returned to work without restrictions and had not been under his care. (Id. ). A physical examination showed a well-healed incision with full range of motion of the digits, no restricted range of motion in the wrist, no atrophy, and insensibility appeared to be intact. (Id. ). Dr. Lanighan found that Plaintiff had ten percent loss of use of the right hand, and ten percent loss of use of the left hand.[3] (Id. ).
These records reveal that while Plaintiff previously suffered from bilateral carpal tunnel syndrome, the bilateral releases performed in 2010 and 2011 resolved this condition. Accordingly, the ALJ's conclusion that the record reveals minimal residual symptoms or work-related limitations stemming from Plaintiff's bilateral carpal tunnel syndrome is supported by substantial evidence.
Plaintiff contends that although he returned to work in February 2011, he continued to report hand fatigue and pain in his palms following the surgeries. (Dkt. 10-1 at 17). Plaintiff also contends that at the administrative hearing, he testified that he had ongoing issues with numbness in three of his fingers. (Id. ). Plaintiff further points to Dr. Vigna's assessment that Plaintiff had limitations with fine manipulation, grasping, gripping, and twisting objects.[4]
*399 (Id. ). Despite Plaintiff's complaints, there is no objective evidence in the record supporting that Plaintiff's bilateral carpal tunnel syndrome qualifies as a severe impairment. See 20 C.F.R. § 416.924(c) (for an impairment to qualify as severe, the impairment must cause more than minimal functional limitations); see also Howard v. Comm'r of Soc. Sec. , 203 F.Supp.3d 282, 296 (W.D.N.Y. 2016) ("[T]he mere presence of a disease or impairment, or establishing a person has been diagnosed or treated for a disease or impairment is not, by itself, sufficient to render a condition severe.") (internal quotation omitted). Rather, the record reveals that, by March 2011, Plaintiff had returned to work, and a physical examination of Plaintiff's wrist, hand, and fingers was normal. (Id. at 887). The Court further notes that an examination by Dr. Liu in August 2014 was normal, with "DTRs physiologic and equal in upper and lower extremities. No sensory deficit noted. Strength 5/5 in the upper and lower extremities." (Id. at 846). Similarly, Dr. Liu noted that Plaintiff's hand and finger dexterity were intact, with grip strength at five out of five bilaterally. (Id. ). In other words, the objective evidence in the record does not support a need for manipulative limitations, and the assessed RFC is supported by substantial evidence. Neither reversal, nor remand, is required on this basis.
C. Consideration of Plaintiff's Daily Activities
Plaintiff next argues that it was improper for the ALJ to cite to Plaintiff's activities of daily living as evidence of his ability to perform substantial gainful activity. (Dkt. 10-1 at 18). Plaintiff points specifically to the ALJ's credibility finding:
After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
[Plaintiff] admitted that despite his symptoms and limitations, he could prepare healthy meals on a daily basis, mow the lawn with a self-propelled mower, wash dishes, go for walks, drive, care for his dogs (with assistance from others) and use a computer. In August 2014, he admitted he cooked four times a week, cleaned the house twice a week, showered 14 times a week and dressed himself every day.
(Dkt. 8 at 20). Plaintiff's argument misses the mark. "The issue is not whether Plaintiff's limited ability to undertake normal daily activities demonstrates [his] ability to work. Rather, the issue is whether the ALJ properly discounted Plaintiff's testimony regarding [his] symptoms to the extent that it is inconsistent with other evidence." Morris v. Comm'r of Soc. Sec. , No. 5:12-cv-1795 (MAD/CFH), 2014 WL 1451996, at *8, 2014 U.S. Dist. LEXIS 51036, at *21 (N.D.N.Y. Apr. 14, 2014).
While it is true that the capability to perform activities of daily living is not inherently inconsistent with a finding of disability, "[t]he law is clear that the ALJ may consider ... [a claimant's] purported activities of daily living for the purposes of a credibility determination."
*400 Cahill v. Astrue , No. 1:11-CV-148, 2012 WL 3777072, at *5, 2012 U.S. Dist. LEXIS 123824, at *15 (D. Vt. Aug. 29, 2012). Indeed, the Commissioner's regulations expressly identify "daily activities" as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms. 20 C.F.R. § 416.929(c)(3)(i). Accordingly, the ALJ's consideration of Plaintiff's activities of daily living was proper in this instance. See Rusin v. Berryhill , 726 F. App'x 837, 840 (2d Cir. 2018) (severe limitations claimed by the plaintiff were inconsistent with the plaintiff's report that he "cooked simple meals daily, left the house daily, can drive, and shopped for groceries every two weeks").
Plaintiff contends that the ALJ misconstrued his testimony regarding his activities of daily living because the ALJ "omitted critical qualifying statements from Plaintiff's Function Report and testimony." (Dkt. 10-1 at 18). Specifically, Plaintiff contends that although he was able to complete tasks such as mowing the lawn, preparing meals, and other household chores, he required breaks when mowing the lawn and help from others to complete chores, and the ALJ failed to consider these facts when making her findings. (Id. ). However, a review of the written determination reveals that the ALJ did consider Plaintiff's need to take breaks when performing certain tasks. (See Dkt. 8 at 19 (discussing Plaintiff's testimony that he "could only sit for 15 minutes before needing to change positions" and could perform "minimal daily activities," but "required breaks with chores" and "took longer to mow the lawn[.]") ). As to Plaintiff's claim that the ALJ misconstrued evidence relating to Plaintiff's ability to prepare meals, the Court has reviewed the written determination and finds that the ALJ did not misconstrue this particular detail. Rather, the ALJ accurately cited to the report of Dr. Liu, where Plaintiff reported that, as a part of his activities of daily living, "[h]e could do cooking four times a week and cleaning house twice a week." (See id. at 20, 844).
"[T]he ALJ is not required to discuss every piece of evidence before her." Brown v. Comm'r of Soc. Sec. , No. 5:15-cv-1506 (GTS), 2017 WL 2312914, at *5, 2017 U.S. Dist. LEXIS 80847, at *14 (N.D.N.Y. May 26, 2017) ; see also Conlin v. Colvin , 111 F.Supp.3d 376, 388 (W.D.N.Y. 2015) ("the ALJ is not obligated in a social security disability benefits case to explicitly reconcile every conflicting shred of medical testimony[.]"). It is clear from the written determination that the ALJ considered evidence that weighed against Plaintiff and evidence weighing in his favor, including that Plaintiff found it difficult to complete certain tasks or needed breaks while performing chores. In other words, "[b]ecause this Court is able to glean the ALJ's rationale and the basis for her findings from the decision, the ALJ did not commit reversible error in failing to explicitly discuss the evidence Plaintiff points to in his brief." Brown , 2017 WL 2312914, at *5, 2017 U.S. Dist. LEXIS 80847, at *15. Accordingly, neither reversal, nor remand, is required on this basis.
D. Consideration of Plaintiff's Learning Disability
Plaintiff's final argument is that the ALJ erred by failing to consider and/or develop the record regarding his reading ability. (Dkt. 10-1 at 20). Although Plaintiff did not identify a learning disability on his disability application, Plaintiff's attorney questioned Plaintiff about his difficulty reading and writing at the administrative hearing. (See Dkt. 8 at 57-58). Plaintiff testified to the following: he was in special education classes starting in fourth grade *401 for reading, writing, and math; he still had difficulty with reading and math; and his wife helped him if he was unable to read something on his own. (Id. at 58). The record further reveals that in October 2015, Plaintiff underwent testing by Buffalo Behavioral Psychology, P.C., in preparation for the installation of a spinal cord stimulator. (Id. at 970-71). This testing showed that Plaintiff read at a fourth-grade level and had difficulty with reading and writing, which would interfere with his ability to maintain non-labor-based employment. (Id. at 971). Plaintiff does not specifically explain how the record should have been further developed; likewise, at the administrative hearing, Plaintiff's counsel represented that the record was complete and did not request any further development as to Plaintiff's alleged learning disability. (Id. at 35).
To the extent the ALJ should have included limitations relating to Plaintiff's learning disorder in the RFC, or further developed the record on this issue, any such error is harmless. At the administrative hearing, Plaintiff's counsel specifically asked the vocational expert what jobs would be available if the RFC formulated by the ALJ also incorporated limitations for reading, writing, and math at a fourth-grade reading level. (Id. at 75). In response, the vocational expert testified that, even with those additional limitations, Plaintiff would be able to perform the jobs of surveillance system monitor and call out operator. (Id. ). In other words, even viewing the record in the light most favorable to Plaintiff as to any alleged learning disability, Plaintiff would not qualify as disabled under the Act. Neither reversal, nor remand, is required on this basis.
CONCLUSION
For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 15) is granted and Plaintiff's motion for judgment on the pleadings (Dkt. 10) is denied. The Clerk of Court is directed to enter judgment and close this case.
SO ORDERED.

When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

Plaintiff does not specifically ask the Court to remand the case to the ALJ for further proceedings; rather, he seeks reversal of the Commissioner's decision, and remand for calculation and payment of benefits. (See Dkt. 10-1 at 1, 13, 22). However, in reviewing the decision of the Commissioner, the Court has also considered whether remand for further proceedings would be appropriate in this case.

Dr. Lanighan also found that Plaintiff had a zero percent temporary impairment. (Id. at 889).

While Dr. Vigna found that Plaintiff had no "significant limitations with reaching, handling or fingering," he also assessed that Plaintiff could use the bilateral upper extremities to grasp, turn, and twist objects, or use them for fine manipulations, only fifty percent of the time. (Dkt. 8 at 869). These two findings appear to be at odds with each other. In any event, as noted above, the severe limitations assessed by Dr. Vigna are not supported by the record, and conflict with his own treatment notes, which contain very little objective evidence supporting severe limitations for reaching, handling, or fingering.